IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| WILLIAM S. RODEN | ) | Case No. 11-80974-JAC-7 |
| XXX-XX-5997 | ) | |
| ELIZABETH H. RODEN | ) | |
| XXX-XX-9331 | ) | |
|     Debtor. | ) | Chapter 7 |
| | | |
| FARMERS EXCHANGE BANK, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | AP No. 11-80081-JAC-7 |
| | ) | |
| WILLIAM S. RODEN, | ) | |
| ELIZABETH H. RODEN | ) | |
|     Defendants. | ) | |

## MEMORANDUM OPINION

On November 14, 2012, this matter came before the Court for trial on the complaint of Farmers Exchange Bank ("FEB"). Previously this Court entered partial summary judgment against FEB on its claim against the debtor under § 523(a)(4), but reserved the issue of § 523(a)(6) for trial. In conformity with the findings of fact and conclusions of law dictated into the record in open court and as set forth below, the Court finds that the debtor is personally liable for the indebtedness of Lease Linc, LLC ("Lease Linc") in the amount of $75,107.94 and that the debt is due to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

## FINDINGS OF FACT

1. Prior to filing for Chapter 7 bankruptcy on March 14, 2011, the defendant, William S. Roden ("Roden"), acted as the managing member and sole employee of Lease Linc. Lease Linc was engaged in the business of purchasing equipment and leasing it to third-parties. Lease Linc financed with various financial institutions the acquisition of the equipment to be leased. The lenders would pay a one time fee to Lease Linc and would

take a security interest in the leased equipment and the stream of lease payments from the lessee to the lessor. In return, Lease Linc would collect the monthly lease payments and remit same to the respective lender. In essence, Lease Linc received a one time fee from the lender up front and from that point forward just served as a collector of the lease payments and remitted same to the lender. The lending arrangement between Lease Linc and the various lenders was made without recourse to Lease Linc. Roden testified that this was the norm for this type of business.

2. On March 15, 2011, Lease Linc filed a no asset Chapter 7 case, case no. 11-80992-JAC-7, and listed FEB as a secured creditor in the amount of $1,380,669.34.

3. Beginning in 2007, FEB entered into a series of loans with Lease Linc as borrower in which FEB extended loans to Lease Linc to finance the purchase of equipment and vehicles which Lease Linc then leased to its customers.

4. Lease Linc was to repay the loans from the monthly lease payments received by Lease Linc for each respective lease, less certain amounts withheld for taxes.

5. "Each loan from FEB to Lease Linc was [without recourse and was] secured in part by a Security Agreement and Assignment of Lease, under which Lease Linc assigned and granted to FEB a security interest in, among other things, the underlying lease and all schedules thereto, all rents due to Lease Linc under the lease and schedules, all rights of Lease Linc to receive and collect lease payments, and the Equipment which is the subject of the respective lease and schedules."[1] Title to each piece of equipment remained in the name of Lease Linc.

6. Paragraph 6.2 of the security agreements and lease assignments provided that Lease Linc authorized FEB to give written notice of the assignments to any lessee "and, regardless of

---

[1] Motion for Summary Judgment, ECF No. 29, Ex. A, Scott Aff. ¶ 7.

the occurrence or non-occurrence of any default by [Lease Linc], in [FEB's] own name and right to ask, demand, collect, receive, receipt for and enforce all rents and other sums due" under any lease.[2]

7. Paragraph 6.4 further reads:

    Debtor [Lease Linc] will not in any manner hinder or interfere with the Lender [FEB] in making collections under any lease and any collateral Documents and does hereby authorize and empower Lender to receive all rents and other sums which are the subject matter of the assignment of lease contained herein at the place of payment designated by Lender.[3]

8. During 2010, Lease Linc became delinquent in remitting monthly lease payments to FEB. Roden testified that Lease Linc did not segregate payments received from lease customers regardless of whether the underlying equipment was financed by FEB or one of the other banks Lease Linc used to finance the purchase of equipment. Instead, all lease payments were deposited into a single account. Although the lease transactions funded by FEB were not in serious default, Roden made the decision to use lease payments assigned to FEB to make payments to other banks and to spread the loss between the banks. Lease Linc received lease payments from its FEB lease customers which it did not remit to FEB as required by the various lease assignments.

9. Lease Linc failed to remit to FEB certain lease payments received from various lessees in the months of October 2010, November 2010, December 2010, January 2011, and February 2011.[4]

---

[2] *See* Plaintiff's Ex. 2, Security Agreement and Assignment of Lease.

[3] Plaintiff's Ex. 2, Security Agreement and Assignment of Lease.

[4] *See* Plaintiff's Ex. 5.

3

10. FEB's Chief Credit Officer and Senior Vice President, Donna Scott, testified that from October of 2010 through February of 2011, Lease Linc collected but failed to remit to FEB monthly lease payments totaling $75,107.94.

11. Plaintiff's Exhibit 5, Payments Not Remitted to FEB, reveals that during the time period at issue from October 2010 through February 2011, Lease Linc owed FEB lease payments totaling $39,583.47 per month.

12. During the month of October 2010, Lease Linc remitted lease payments to FEB totaling $33,385.14. Lease Linc collected but failed to remit to FEB lease payments totaling $6,198.33 during October of 2010.

13. During the month of November 2010, Lease Linc remitted payments totaling $27,958.58 to FEB while failing to remit collected payments totaling $11,624.89.

14. During December of 2010, Lease Linc remitted payments to FEB totaling $29,393.31 while failing to remit collected payments totaling $10,190.16.

15. During January of 2011, Lease Linc remitted payments to FEB totaling $27,553.38 while failing to remit collected payments totaling $12,030.09.

16. During the months of October 2010 through January of 2011, Lease Linc remitted more than half of the lease payments due FEB each respective month, and the bank continued to work with Lease Linc to collect payments.

17. In February of 2011, Lease Linc collected but failed to remit to FEB payments totaling $35,064.47. For the month of February 2011, Lease Linc only remitted to FEB lease payments totaling $4,519.00.[5]

---

[5] Plaintiff's Ex. 5.

4

18. The charts below reflect the lease payments collected, but not remitted from October of 2010 through February 2011:

| DEFAULT | Lease Payments Due | Collected | Remitted | Not Remitted |
|---|---|---|---|---|
| **Oct. 2010** | $39,583.47 | $39,583.47 | $33,385.14 | $6,198.33 |
| **Nov. 2010** | $39,583.47 | $39,583.47 | $27,958.58 | $11,624.89 |
| **Dec. 2010** | $39,583.47 | $39,583.47 | $29,393.31 | $10,190.16 |
| **Jan. 2011** | $39,583.47 | $39,583.47 | $27,553.38 | $12,030.99 |
| **Feb. 2011** | $39,583.47 | $39,583.47 | $4,519.00 | $35,064.47 |



5

19. From October of 2010 until Lease Linc filed for bankruptcy relief on March 15, 2011, William Roden acted as the sole managing member and employee of Lease Linc. Roden controlled both the receipt of and disbursement of funds for Lease Linc.

20. FEB's former President and Chief Executive Officer, Dr. Robert Bennett ("Bennett"), acted as the bank's intermediary with Lease Linc.

21. Bennett testified that FEB essentially purchased a stream of payments from Lease Linc. The third-party lessees made monthly payments to Lease Linc and FEB depended on Lease Linc to collect the lease payments and promptly forward same to the bank. Lease Linc made a service fee upon the origination of each lease with its customer and then the bank made its money upon receipt of the lease payments. Lease Linc made its money up front while FEB was paid back over time from the stream of payments with interest.

22. Bennett explained that the transactions with Lease Linc differed from a standard loan made by FEB directly to a bank customer. In a standard loan transaction, FEB has a direct, one-on-one relationship with the customer seeking a loan for the purchase of a home, land, etc. With the Lease Linc transactions, Lease Linc had the direct relationship with the customer and the bank's relationship was with Lease Linc. The bank did not have a direct one-on-one relationship with the lease customers.

23. Bennett testified that sometime early in 2010, FEB became aware that Lease Linc was encountering financial difficulty as some of the lease payments to the bank became past due. According to Bennett, Lease Linc's payments to FEB became somewhat sporadic, but Lease Linc would eventually make up the payments.

24. Bennett and Roden emailed each other regularly beginning in June of 2010 regarding Lease Linc's delinquent lease accounts and Bennett testified that Roden always responded timely to inquiries from the bank regarding the delinquent accounts.[6]

25. In an email dated August 17, 2010, Bennett wrote "nearly every lease we have with you is now past due. Clearly this is unacceptable. I trust at least the majority of these will be current by early next week." Roden responded on the same day that he had just returned "from finally doing a few lease deals" and promised to come in the following morning with "checks" in hand.[7]

26. On December 1, 2010, Bennett emailed Roden regarding a particular account explaining that the bank had received "flack from examiners on Spectrum" in the past and FEB needed this account to be current before the examiners returned. On December 3, 2010, Roden responded that he remembered the "flack" and that he was working to correct the problem and would "get caught up ASAP and keep it that way."[8]

27. On December 16, 2010, Bennett emailed Roden requesting that Lease Linc become current "immediately." Roden responded on December 29, 2010, by requesting a personal loan to pay "everything current." Roden again assured Bennett that he had "seen a (sic) increase in lease quotes and interest in replacing equipment and trucks with several current customers."[9] On January 3, 2011, Bennett explained by email that the bank could not extend Roden $50,000 in unsecured debt, further stating, "Clearly we

---

[6] *See* Plaintiff's Ex. 3, Email Correspondence.

[7] Plaintiff's Ex. 3, Email Correspondence.

[8] Plaintiff's Ex. 3, Email Correspondence.

[9] Plaintiff's Ex. 3, Email Correspondence.

7

Case 11-80081-JAC   Doc 98   Filed 01/30/13   Entered 01/30/13 09:47:25   Desc Main
Document      Page 7 of 19

need you to forward the various payments on to us as soon as possible."[10] Roden testified that Bennett made it clear that the delinquencies were causing problems for the bank.

28. Given the continued assurances that Roden was seeing an increase in lease quotes, FEB continued to work with Roden and Lease Linc until Lease Linc filed bankruptcy. After Lease Linc filed for bankruptcy, FEB went directly to the lessees and requested that the lessees begin making payments directly. Once the direct payments were established, none of the lessees failed to make the direct payments to the bank. Bennett testified that the bank did not contact the lessees and request direct payments prior to the petition date out of fear that such contact would damage Lease Linc's direct relationships with the lessees and further hamper Lease Linc's business and ability to make future payments and generate new business.

29. Throughout 2010, FEB did not require Lease Linc to open a separate, segregated account for lease payments or to move its bank account to FEB nor did the underlying contracts require same. This appears to have been the normal practice for this type of business. Instead, Lease Linc would collect lease payments and deposit same into one account from which Lease Linc made payments to FEB as well as other banks that financed additional pieces of equipment for Lease Linc. Roden testified that once money was deposited into Lease Linc's account, he would spread the money out among the banks. Roden testified that Lease Linc became delinquent to FEB by virtue of defaults in lease transactions funded by other banks. In other words, Lease Linc used lease payments that were assigned to FEB to make payments on accounts with other banks.

---

[10] Plaintiff's Ex. 3, Email Correspondence.

8

30. Roden did not personally guarantee or sign in his individual capacity any of the loans FEB made to Lease Linc.

31. Roden testified that he did not receive any compensation from Lease Linc during 2010 and instead put $10,250 of his own funds into the company.

32. Roden began working in the automobile business during the mid-1980's running a dealership. In 1989, Roden began working at a leasing company similar to Lease Linc and worked at the company for ten years before opening Lease Linc.

33. Roden testified regarding the overall impact the economy had on Lease Linc during the relevant time period. Payments from his customers "slowed down" and Lease Linc had to repossess equipment from some of its customers. Despite the assurances Roden made to Bennett that he was seeing an "increase in lease quotes," at trial Roden testified that during 2010 Lease Linc only entered into one new lease transaction. In years before the economic downturn, Lease Linc had entered into as many as 50 to 100 leases per year.

## CONCLUSIONS OF LAW

At the conclusion of the trial on this matter in open court, the Court ruled in favor of FEB and against Roden pursuant to 11 U.S.C. § 523(a)(6). Following the trial while preparing its written decision, the Court reviewed the case of *Wolfson v. Equine Capital Corp.,* 56 F.3d 52 (11th Cir. 1995) which neither party had cited in their pretrial briefs. In *Wolfson*, the Eleventh Circuit held that a creditor waived its right to assert its nondischargeability claim under § 523(a)(6) due to the creditor's failure to take reasonable steps to protect its collateral. On November 16, 2012, the Court entered an order requiring the parties to submit briefs addressing *Wolfson* and any other relevant cases addressing the issues raised therein.

On December 11, 2012, after receiving and considering the parties' post-trial briefs addressing *Wolfson*, the Court entered a second order finding that the five month period at issue during which Lease Linc collected but failed to remit payments to FEB and the bank continued to work with the defendant to collect payments did not appear unreasonable under *Wolfson*. However, the Court remained concerned about the element of malice for purposes of § 523(a)(6) and invited the parties to submit additional briefing on that issue.

The Court having considered the parties' briefs and having further researched the matter itself, finds that FEB has proven the elements of § 523(a)(6) by a preponderance of the evidence. The Court acknowledges that this has been an arduous case to decide, but after fully considering the applicable case law, all the evidence, and the demeanor of the witnesses at trial, the Court finds that FEB has established by a preponderance of the evidence that Roden is personally liable to FEB for the indebtedness of Lease Linc as a consequence of his willful and malicious injury to FEB or the property of FEB within the meaning of § 523(a)(6).

In *Grogan v. Garner*, 498 U.S. 279, 291 (1991), the Supreme Court held that the standard of proof to be applied in all § 523(a) dischargeability proceedings is "the ordinary preponderance-of-the-evidence standard." Thus, as with all dischargeability claims, FEB bears the burden of proving by a preponderance of the evidence that the debt at issue should be excepted from the debtor's discharge. A "preponderance of the evidence" simply means "an amount of evidence that is enough to persuade [the trier of fact] that the Plaintiff's claim is more likely true than not true."[11]

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[12] The

---

[11] *Weathers v. Lanier*, 280 Fed. Appx. 831, 833 (11th Cir. 2008)(*citing* Eleventh Circuit Pattern Jury Instructions (Civil Cases), Basic Instructions 6.1 (2005)).

[12] 11 U.S.C. § 523(a)(6).

Supreme Court held in *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57 (1998) that the word "willful" modifies the word "injury" indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. The Eleventh Circuit has held that "a debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury."[13] For purposes of § 523(a)(6), "act is willful when the debtor intends to inflict the injury or knew that the injury was substantially certain to result."[14] "Malice can be implied when a debtor commits an act that is 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will'"[15]

Although corporate officers are not generally held personally liable for the debts of a corporation, they may be held liable to the extent that their participation in a tortious act results in harm to a third-party. The Eleventh Circuit has published two decisions holding that debts owed by a debtor as a corporate officer were nondischargeable under § 523(a)(6) for failure to remit sales proceeds to secured creditors. In both cases aggravating circumstances existed to show that the debtors willfully and maliciously injured the creditor.

In *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257 (11th Cir. 1988), the Eleventh Circuit found that a debtor, who substantially participated in the operation of a car dealership, had willfully and maliciously converted proceeds from the sale of twelve vehicles sold out of trust.

---

[13] *Thomas v. Loveless (In re Thomas)*, 288 Fed. Appx. 547, 548 (11th Cir. 2008)(*quoting In re Walker,* 48 F.3d 1161, 1165 (11th Cir. 1995)). *See also Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329 (11th Cir. 2012)(finding a judgment creditor's property was injured willfully and maliciously when a Chapter 7 debtor conspired with another defendant to fraudulently transfer unencumbered property to a third-party).

[14] *Citik Ka Wah Bank Ltd. New York v. Wong (In re Wong)*, 291 B.R. 266, 280 (Bankr. S.D.N.Y. 2003).

[15] *Thomas v. Loveless (In re Thomas)*, 288 Fed. Appx. 547, 548 (11th Cir. 2008)(*quoting In re Ikner*, 883 F.2d 986, 991 (11th Cir. 1989)).

11

The debtor argued that he could not be held responsible for conversion because he was not actively engaged in the operation of the dealership, but the Eleventh Circuit rejected this argument because evidence established the debtor's active and substantial participation in the dealership's operations. Moreover, the debtor actually received some of the converted sales proceeds from the cars sold out of trust.

In *Ford Motor Credit Co. v. Owens (In re Owens),* 807 F.2d 1556 (11th Cir.1987), the Eleventh Circuit held that a corporate debt was nondischargeable under § 523(a)(6) in the personal bankruptcy of a corporate officer where the debtor was personally responsible for the day-to-day operations of the dealership and he actively participated in the conversion of cars by the corporation. The debtor was a majority stockholder and president of the corporation and he had sixteen years experience in the automobile industry. The debtor, as president of the corporation, executed a floor plan agreement with Ford Motor Credit under which the creditor would advance the corporation money to purchase vehicles for sale or lease. The floor plan gave the creditor a security interest in the vehicles. The debtor also personally guaranteed payment. Although the corporation was required to hold the sale proceeds in trust for the creditor, the debtor made the decision to dispose of the cars and not turn the proceeds over to the creditor. The Eleventh Circuit held the debtor personally liable for the resulting injury to the creditor based on his official capacity with the dealership and his active participation in the conversion of the property subject to the creditor's security interest. "[A]lthough officers and directors of a corporation are generally not liable for debts of the corporation, they are liable to the extent that their participation in the commission of a tortious act results in some harm to a third party and causes them to be liable to a third party."[16] In *Owens*, the debtor actively participated in the

---

[16] *Ford Motor Credit Co. v. Owens (In re Owens)*, 807 F.2d 1556, 1559 (11th Cir. 1987).

12

conversion of property subject to a security interest because the debtor made the decision to dispose of the automobiles and not to turn over the proceeds to the creditor.

Although the Eleventh Circuit found that the secured creditors established willfulness and malice in both of these cases based on the aggravating circumstances shown, these cases do not stand for an inflexible rule that all sales out of trust are by definition willful and malicious. As explained by the Supreme Court in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934), "a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances." In *Davis,* the debtor borrowed money from the creditor in order to sell cars. He then sold a car without the creditor's written consent which was needed according to the parties' agreement. Instead of repaying the amount owed as required by the agreement, the debtor filed bankruptcy. The Supreme Court held that the sale, although a conversion, did not constitute willful and malicious injury to the creditor because no aggravating circumstances existed.

In *Wolfson v. Equine Capital Corp. (In re Wolfson),* 56 F.3d 52, 54 (11th Cir. 1995) the Eleventh Circuit reinforced the principle that although conversion of collateral can be a willful and malicious injury, "such an injury 'does not follow as of course from every act of conversion, without reference to the circumstances.'" "In some circumstances," the court stated "[t]here may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a wilful and malicious one."[17]

The Eleventh Circuit found that the creditor in *Wolfson* "knowingly acquiesced" to the debtor's business practice of placing sales proceeds from collateralized horses into a general operating account from which the debtor paid ordinary business expenses and the creditor failed

---

[17] *Wolfson v. Equine Capital Corp. (In re Wolfson),* 56 F.3d 52, 54 (11th Cir. 1995).

13

to take "reasonable steps to protect its collateral" when the debtor failed to make timely loan payments. At first blush the facts of *Wolfson* are similar to those present in this case. Lease Linc collected lease payments which were assigned to various banks and placed them into a general operating account from which Lease Linc remitted loan payments to the banks at Roden's discretion and direction. After reviewing *Wolfson*, the Court questioned whether FEB "knowingly acquiesced" to Lease Linc's business practice of placing assigned lease payments into a general operating account from which Lease Linc paid all expenses. Did FEB take "reasonable steps to protect its collateral" when Lease Linc became delinquent in remitting lease payments assigned to FEB, or did FEB waive its right to assert nondischargeability under § 523(a)(6) by continuing to work with Lease Linc rather than immediately exercising its rights under the security agreements to seek direct payments from Lease Linc's customers? Could FEB have protected its collateral more quickly and minimized its loss?

A thorough review of *Wolfson* reveals that the facts of that case are distinguishable from the case before the Court in that the creditor in *Wolfson* continued to renew and extend additional credit to the debtor notwithstanding the creditor's knowledge that sale proceeds from its collateral were being used by the debtor for other purposes. In this case, FEB extended neither Lease Linc nor Roden any new credit during the five month period from October 2010 through February 2011 during which time Lease Linc failed to remit payments received from leases assigned to FEB. In December of 2010, FEB refused Roden's request for a $50,000 personal loan to pay "everything current." Nor was any evidence presented that FEB underwrote any new loans for Lease Linc during this time period. Instead, the President and CEO of FEB, Bennett, maintained contact with Roden throughout this time period by email persistently encouraging Lease Linc to "forward the various payments on to us as soon as possible."[18] While

---

[18] Plaintiff's Ex. 3, Email Correspondence.

14

in retrospect it would have been better for FEB to have contacted Lease Linc's customers in October of 2010 and requested direct payments immediately, Bennett explained that FEB hesitated to seek direct payments and instead continued to work with Lease Linc out of concern that such contact would destroy Lease Linc's relationships with its customers and further hamper Lease Linc's business and ability to generate new business. It would chill efforts for financial institutions to try and work matters out if this Court found that FEB's efforts constituted acquiescence in this case. In essence, FEB worked with Lease Linc for four months while Lease Linc continued to remit substantial lease payments and then took immediate action after Lease Linc failed to remit substantial payments in the fifth month. The evidence reflects that during the time period from October 2010 through January of 2011, Lease Linc while in default was still making substantial payments to FEB, paying more than half of the lease payments due each month. Bennett further testified that throughout 2011, Lease Linc's payments had been sporadic, but Lease Linc would eventually make up the payments. Thus, the Court cannot find that FEB knowingly acquiesced to the use of its lease payments to pay other banks when Lease Linc had historically caught up any deficiencies. Nor does the Court find that FEB waived its right to assert nondischargeability under § 523(a)(6) when FEB was receiving a substantial portion of the lease payments due each month from October 2010 through January of 2011 and FEB had successfully worked with Lease Linc in the past to catch up any sporadic payments. It was not until the month of February 2011 that Lease Linc failed to remit payments to FEB totaling $35,064.47 in a single month, the bulk of FEB's loss. Immediately thereafter, Lease Linc filed bankruptcy and FEB began collecting payments directly from Lease Linc's customers. During the time period at issue, Roden continued to assure Bennett that he was working to bring the accounts current and was seeing an increase in lease quotes. Based on the circumstances of

15

this case, the Court concludes that FEB did not waive its right to assert a claim under § 523(a)(6).

The Court further finds after carefully reviewing the facts of this case that Roden, serving as the managing member and sole employee of Lease Linc, willfully and maliciously converted the lease payments assigned by Lease Linc to FEB. Each time Roden collected a lease payment that had been assigned to FEB and failed to remit the funds to FEB, Roden engaged in an intentional act. As the Eleventh Circuit has stated, "a debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is **substantially certain to cause injury**."[19] Clearly, Roden knew that the failure to remit the lease payments was "substantially certain to cause injury" to FEB. The email correspondence between Roden and Bennett clearly demonstrated that Roden was well aware that his failure to remit lease payments to FEB was causing problems for the bank with state and federal examiners and was "substantially certain to cause injury" to FEB. Roden testified at trial that Bennett made it clear that the delinquencies were causing problems for the bank. Roden understood that FEB made its money on each transaction over time as the lease payments were remitted by Lease Linc and that FEB would be injured if Lease Linc failed to remit same. Thus, the Court is satisfied that FEB has proven by a preponderance of the evidence for purposes of § 523(a)(6) that Roden willfully converted the lease payments assigned by Lease Linc to FEB.

The Court is further satisfied that FEB has proven the element of malice by a preponderance of the evidence. Roden argues that he fully intended to repay his creditors and merely ran out of money. The Eleventh Circuit has explained on more than one occasion that

---

[19] *Thomas v. Loveless (In re Thomas)*, 288 Fed. Appx. 547, 548 (11th Cir. 2008)(*quoting In re Walker,* 48 F.3d 1161, 1165 (11th Cir. 1995)). *See also Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329 (11th Cir. 2012)(finding a judgment creditor's property was injured willfully and maliciously when a Chapter 7 debtor conspired with another defendant to fraudulently transfer unencumbered property to a third-party).

16

"special malice" or "a showing of specific intent to harm another" need not be proven for purposes of § 523(a)(6).[20] Instead, "[c]onstructive malice or implied malice can be found if the nature of the act itself implies a sufficient degree of malice."[21]

In the case of *Automotive Fin. Corp. v. Miles (In re Miles)*, 2007 WL 7141214 (Bankr. N.D. Ga. 2007), the corporate officer of an internet car dealership argued that his failure to remit the proceeds from out-of-trust vehicles was not willful and malicious because he used the proceeds to continue the corporation's business operations and always intended to bring his account with the plaintiff current through the sale of additional vehicles. The bankruptcy court recognized that where evidence suggests that a debtor has used the proceeds from the sale of secured collateral as a means to continue business operations and to increase the amount of funds available for repayment to a secured creditor such evidence may preclude a conclusion that the debtor acted with malice. However, the court was not persuaded that the debtor's conduct was in fact motivated by a sincere desire to maintain the business for the purpose of repaying secured creditors. Instead, the court found that the debtor must have realized that it would have been impossible for the corporation to bring the plaintiff's account current by continuing to sell vehicles out of trust where the debtor had substantial experience in the retail automobile industry having operated his own business for several years. The debtor clearly knew and understood the corporation's general financial condition and would have known to a substantial certainty that the plaintiff's security interest would be harmed by the continued out-of-trust sale of vehicles. Rather than winding down the corporation's business or giving the plaintiff the choice as to

---

[20] *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 991 (11th Cir. 1989); *See also Maxfield v. Jennings (In re Jennings)*, 670 F.3d 1329, 1334 (11th Cir. 2012); *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995).

[21] *In re Ikner*, 883 F.2d 986, 991 (11th Cir. 1989).

whether to continue extending credit, the debtor consciously chose to continue selling vehicles without remitting sales proceeds to the plaintiff.

In this case, the Court finds that Roden was clearly aware that his acts violated the property rights of FEB and that the nature of the acts committed by Roden imply a sufficient degree of malice for purposes of § 523(a)(6).[22] Roden acted as the managing member and sole employee of Lease Linc. Roden had substantial business experience in the equipment leasing industry. He knew the cash flow of Lease Linc and was in the best position to determine when the company no longer had enough money to continue operating. Roden would have known to a substantial certainty that FEB's security interest in the leases and all the rents due under the leases would be harmed by Lease Linc's failure to remit same to FEB. It was the clear intent of the parties that as the lease payments were made, Lease Linc was to turnover the lease payments to FEB. During the relevant time period, Roden made the conscious voluntary decision to spread Lease Linc's losses among all lenders even though the leases assigned to FEB were not in serious default. Roden knowingly and consciously made these decisions in violation of FEB's security agreements, wrongfully and without just cause. The Court further finds that Roden knew his acts were substantially certain to cause injury to FEB. Roden's testimony that he simply ran out of money in no way creates any just cause or mitigates the Court's finding of malice under the circumstances of this case. Roden, an experienced businessman, was in the best position to know when Lease Linc was no longer a viable entity, yet he continued to use lease payments assigned to FEB without fear of reprisal due to the non-recourse nature of the FEB promissory notes.

---

[22] *Automotive Fin. Corp. v. Penton (In re Penton)*, 299 B.R 701, 705 (Bankr. S.D. Ga. 2003)(explaining that an officer of a corporation acts 'maliciously' if he is aware that his actions "violate the property rights of another.")

18

In conclusion, having carefully considered the record, the Court finds that the debt owed to FEB by the debtor in the amount $75,107.94 of is nondischargeable pursuant to § 523(a)(6).

A separate order will be entered consistent with this opinion.

Done and Ordered this day January 30, 2013

/s/ Jack Caddell
Jack Caddell
U.S. Bankruptcy Judge